The State of Ohio, Appellee, *v.* Scarberry, Appellant.

(No. 708—Decided January 5, 1961.)

Mr. *Everett Burton*, prosecuting attorney, and Mr. *Howard H. Harcha, Jr.*, for appellee.
Mr. *Edgar H. Hale*, for appellant.

RADCLIFF, J.   The Scioto County Grand Jury for the term of January 1960 returned two indictments of first degree murder against Alfred Scarberry.   The alleged victims were Kenneth Scarberry, aged two years, and David Scarberry, aged ten months, sons of Alfred Scarberry.   On January 8, 1960, after appointment of defense counsel, arraignment was had and the defendant entered pleas of not guilty and not guilty by reason of insanity to both indictments.

The two cases were consolidated by order of the trial court on March 5, 1960.   Trial was had, starting on April 19, 1960, resulting in a verdict of guilty of murder in the first degree as charged in each indictment.   The jury recommended mercy as to both offenses.   The defendant was sentenced to life imprisonment for each offense, the sentences to run concurrently.   After defendant's motion for a new trial was overruled this appeal was perfected.

The facts, sufficient for our review, are as follows:

The defendant, Alfred Scarberry, his wife, Dorothy, and five of their nine children were living on Camp Street in Sciotoville, a part of the city of Portsmouth, Scioto County, Ohio, on December 12, 1959.   A short time prior to this date all nine of the Scarberry children had been made wards of the Juvenile Court of Scioto County, four of the oldest children having been taken away from the home.   The five younger children were permitted to stay with their parents.

At about 3 p. m. on December 12, the defendant was waiting in the yard of Alfred Eldridge, an uncle of Dorothy Scarberry, when Eldridge and his wife and Arthur Sullivan and his wife returned from purchasing groceries.   All these people lived on Camp Street.   The three men went to Canter's Market, where they bought more groceries.   They then proceeded to Millbrook Inn, a tavern in the city of New Boston, and there each consumed three bottles of beer.   Before leaving Millbrook Inn,

Sullivan and Eldridge purchased a bottle of wine. The three stopped for a short while under the Highland Bend bridge across the Scioto River and drank part of the bottle of wine. All three returned to Camp Street and Sullivan went to his home. The defendant and Eldridge searched for a time for some old tires that Scarberry could use in his heating stove. About 4:30, the men separated, Eldridge going to his home and Scarberry going to his home some yards distant. Both Sullivan and Eldridge observed that Scarberry had been drinking, but was not drunk the last time they saw him on December 12, 1959.

The defendant proceeded to his home, arriving there between 4:30 and 5 p. m. Scarberry entered the kitchen, seated himself at the kitchen table and started to feed one of his children with a large spoon. He was feeding David, aged ten months, and the spoon was much too large and apparently hurt the child's mouth. The baby cried out and the mother remonstrated with the defendant. The defendant lost his temper, threatened to set the house on fire and demanded to know the location of the lighter fluid. He ordered his wife to take the baby, David, and get out of the house. Mrs. Scarberry went to the back porch. She heard Kenneth crying in the house. She went back in the house and found it full of smoke. She picked up Kenneth, then Scarberry took the child away from her and took him back in the front room. Mrs. Scarberry looked in the front room and saw that the stove had been overturned. She told her husband that she was going to call the police. Scarberry then said he would put the fire out. Mrs. Scarberry went back out on the porch, picked up David and held him in her arms. In a few moments Scarberry came out of the house with Kenneth in his arms and started down the path which leads to the Little Scioto River, not far from the Scarberry home, Mrs. Scarberry remonstrated with her husband, telling him not to hurt the child, whereupon Scarberry came back, took David from her arms and turned and ran down the path towards the river, shouting, "I'm going to drown them." Mrs. Scarberry started after the defendant, but was unable to catch him. The last time she saw the defendant on December 12, and the last time she ever saw her two youngest children, Scarberry had one child under each arm and was running down the path that leads

to the Little Scioto River. Mrs. Scarberry then went to her uncle's, Alfred Eldridge, to get help. (Alfred Eldridge was the person with whom Scarberry had been drinking earlier in the afternoon.)

We must depart from this chronological resume of the facts to bring in some of the background which led up to the tragic climax of December 12. For some time, the defendant had been quarreling with his wife about the paternity of the two youngest children, Kenneth and David. He had accused her of being familiar with another man, and in fact insisted to his wife that the other man was the father of both Kenneth and David. He had threatened to drown them. This attitude on the part of the defendant had been apparent for some time and had led to calling the police to the Scarberry home on Camp Street on at least two prior occasions. It resulted in the Juvenile Court taking the action it did in making all the children wards of the court and taking the four oldest children away from the home.

From the time Scarberry and the two children disappeared down the path leading to the west bank of the Little Scioto River, Kenneth under one arm and David under the other, no one saw Alfred Scarberry until 6:15 p. m. on December 12 at the home of C. C. Withrow on the east side of the Little Scioto River. To this day, no one has seen Kenneth Scarberry or David Scarberry. Scarberry presented himself at the door of the Withrow home, knocked and asked him if he could come in and wash his hands, and told Withrow that "he had swum the river." When Scarberry came into the house Withrow noticed that he was dripping wet, at least his feet and legs were. When Withrow asked him what the matter was. Scarberry replied, "family trouble." Scarberry left the Withrow home, telling them that he wanted to go down to the highway and call the police. Scarberry next appeared at the home of Shirley Elifrit, an employee of the C. & O. Railroad, who lives on Gallia Street in Sciotoville on the east side of the Little Scioto River. He knocked at the door of the Elifrit house at about 6:30 p. m. and told Elifrit he wanted to call the police. Being questioned by Elifrit, he replied that he fell in the creek and got wet. He told Elifrit his name and where he lived. When Elifrit suggested that he take him home, Scarberry said "he didn't want to go

home for they were probably looking for him." Asked who; he answered, "the police." Scarberry then asked Elifrit to take him to the New Boston police. They started for the New Boston police station, but Scarberry asked him to take him to the Portsmouth police department, then asked to be taken to the Veteran's hospital up on the hill. Elifrit suggested that he take him to the police as they could get him to the hospital quicker. Scarberry next insisted that he take him to Mercy Hospital. Elifrit refused and let Scarberry out at the corner of 14th and Robinson streets in Portsmouth. Scarberry told him that he would make a phone call from a nearby store. Elifrit testified that Scarberry was wet, cold, and scared; that the seat of the car was wet where Scarberry sat; and that there was mud on the floorboard where Scarberry's feet had been.

Scarberry next appeared at a grocery operated by Nellie Payne in her home at 1330 Robinson Avenue. He entered the store and asked Mrs. Payne "to call and tell them to come and get me." In answer to her inquiry, he said, "the receiving hospital." Then Scarberry asked her to call the police, but Nellie Payne refused to do so as it was not her policy to call the police on any one. Scarberry left the store. Scarberry next appeared at the Windel-Howland Funeral Home, 1503 Offnere Street. There, he talked to James Purdy, the owner of the establishment. This occurred at about 7 p. m. on December 12. Purdy described Scarberry as being disheveled and wet. Purdy offered to assist him, and Scarberry asked him to take him to the Portsmouth Receiving Hospital. An employee of Purdy, James McGlone, came in shortly thereafter. He had been driving the flower car. Scarberry left with McGlone who was to drive him to Portsmouth Receiving Hospital. McGlone drove to the Portsmouth Receiving Hospital. During the ride Scarberry told him that it was a long walk from the river to where he had picked him up. McGlone described him as being soaking wet, with water dripping from his clothing to the floor of the truck. McGlone let Scarberry out, and when he started up the walk leading from the street to the hospital McGlone drove away. He learned no more of the incident until he read of it in the paper the next day. The same is true of Purdy, Elifrit and Withrow.

Scarberry next was seen by Ruby Holtz, switchboard oper-

ator and receptionist at the Portsmouth Receiving Hospital. He approached her desk in the lobby sometime after 7 p. m. She described him as "very dirty," and, "I think he was wet." Scarberry was informed that he could not be admitted without a physician ordering it. Scarberry then asked her to call the police and remained in the hospital until the officers arrived and placed him under arrest.

We must now go back in point of time for a few hours. Lieutenant Charles L. Fuggitt of the Portsmouth Fire Department testified that he was on duty at fire station No. 4 in Sciotoville on December 12, and that at 5:55 he received a telephone call saying that some man was trying to start a fire in his home on Camp Street. Fuggitt proceeded to the house on Camp Street and found that the stove had been overturned, but the fire had been extinguished. (The fire had been put out by Marion Eldridge and a Mr. Shadd.) Fuggitt was told of Scarberry's actions earlier, so he proceeded to the river and began to search for Scarberry and the two children. Firemen and neighbors searched the fields and both banks of the river, but were unable to find either Alfred Scarberry, Kenneth Scarberry or David Scarberry.

Scarberry was held in the Portsmouth city jail from the time of his apprehension at about 7:30 p. m. on December 12 until, after arraignment, when he was taken to the Lima State Hospital for observation.

Shortly after 8 a. m. on December 13, 1959, Scarberry was interviewed by detective William Huels of the Portsmouth police department. He made a statement to detective Huels, describing his activities from the time he got up in the morning until he ran from his home to the stream with his two boys in his arms. He admitted jumping into the Little Scioto River, which was swollen and swift, with the babies in his arms. When completely submerged, he released his hold on the two children and they were swept from his arms by the current. Scarberry stated that he came to the surface about a hundred feet down stream and almost on the opposite side of the Little Scioto River from the point from which he had jumped. He managed to grasp some brush that was caught on a snag in the river and pulled himself to safety on the opposite side. He saw nothing of the boys. The statement was reduced to writing by

detective Huels in the presence of Scarberry. At about 11:30 a. m. on December 13 he signed the statement in the presence of detective Huels and Sergeant Charles Hickman of the Portsmouth Police Department. Both officers heard Scarberry state, "Yes, that is the way it happened," and saw him sign his name to the statement. The officers then signed as witnesses and initialed each page. The statement, including the confession, was admitted into evidence.

The defendant, Scarberry, urges the following assignments of error:

1. The verdicts are not sustained by sufficient evidence and are against the manifest weight of the evidence.

2. The verdicts are contrary to law.

3. Errors of law occurring at the trial.

4. The judgment of the jury is contrary to law and the trial court erred in failing to set aside the judgment upon the motion of defendant for a new trial and to grant the defendant a new trial.

The assignments of error raise three questions: First, that the corpus delicti was not established by other evidence of sufficient verity or amount to warrant admission of the confession. Second, that the confession was not voluntary, and consequently it should not have been admitted in evidence. Third, the trial court erred in permitting the psychiatrist, a witness for the state, to give testimony on rebuttal as to the mental condition of Scarberry. We will dispose of the issues raised on appeal in the order in which they are recited above.

We are all aware of the reason behind the rule prohibiting conviction of a crime solely upon the confession of an accused person. The rule came into being to prevent the possibility of a miscarriage of justice such as that in *Perrys' Case*, 14 How. St. Tr., 1312. The Ohio rule is best set forth in the case of *State* v. *Maranda*, 94 Ohio St., 364. In that case, the Supreme Court of Ohio defined corpus delicti and established the principle that there must be *some* evidence outside the confession tending to establish the corpus delicti before a confession may be admitted in evidence. This evidence does not have to overcome a reasonable doubt or even establish a prima facie case. It is sufficient if it tends to prove some material element of the offense. The rule of the *Maranda case* is the law of Ohio today.

See *City of Columbus* v. *Turner*, 106 Ohio App., 349, 353 (affirmed, 167 Ohio St., 541); *City of Columbus* v. *Glover*, 107 Ohio App., 107, 108; and *State* v. *Cosby*, 110 Ohio App., 222, 227 (appeal dismissed, 170 Ohio St., 440). There is an excellent annotation in 45 A. L. R. (2d), 1321 *et seq.* The following texts have helpful discussions of this point of law: 2 Burdick's Law of Crime, Section 424, and 1 Underhill's Criminal Evidence (5 Ed.), Section 36.

The above authorities give us the law, and we must now apply this law to the facts before us.

It is true that no one saw Scarberry enter the Little Scioto River with his infant sons in his arms. It is also true that no one has seen Kenneth and David Scarberry, or their bodies, since shortly after 5 p. m. on December 12, 1959. There is evidence that Scarberry disappeared down the path to the Little Scioto River with his sons in his arms, vowing to drown them. He had made this threat in the past as well as contemporaneously with his actions on December 12. The mother of the children was unable to catch him or stop him. (She was pregnant at the time.) She was the last person to see Scarberry or the two children until Scarberry appeared on the opposite side of the river without the children sometime later. The fire and police departments of the city of Portsmouth searched both sides of the river and the surrounding area, from 6 p. m. on December 12 until 12 noon on December 13. Members of the family searched for an additional 24 hours, but were unable to find any evidence of the whereabouts of the infants. The Little Scioto River was swollen and swift. It had a depth of about 14 feet at the place where Scarberry said he jumped in the stream. These children were unable to defend themselves in any way against human assault, attack by animals or the adversity of nature. One baby could not even walk, the other was a toddler. They could not swim. The weather was cold and disagreeable; the river swift. The age of these children, the condition of the stream, and the season of the year, in our minds make it impossible for these children to have survived. In our opinion, this is compelling evidence. The requirement that *some* evidence of the corpus delicti other than that in the confession has been met in sufficient degree to satisfy the law of Ohio on this point, thus making the confession admissible.

The first issue raised by the assignments of error is not well taken.

The second issue goes to the voluntary or involuntary character of the confession of Scarberry. Scarberry did not testify in his own defense, but during the hearing conducted by the court, out of the presence of the jury, he did testify. The court heard evidence as to the circumstances surrounding the confession. Scarberry testified that patrolman David Miller, while leading him from his cell to the interrogation room in the Portsmouth city jail, at about 8 a. m. on December 13, struck him on the side of the head and then in the stomach; that he fell to the floor; and that Miller jerked him to his feet and took him into the interrogation room. Officer David Miller of the Portsmouth Police Department, who arrested Scarberry at the Portsmouth Receiving Hospital, testified that he struck Scarberry with his open left hand on the side of the face as he was leading him from his cell to the interrogation room. Officer Miller, by way of explanation, said that he had been on duty continuously for over 24 hours and had spent a great deal of that time along the river searching for the two children. He testified that he was thoroughly disgusted with Scarberry; that he did slap him; and that this incident occurred shortly after 8 a. m. on December 13. Miller testified further that he took Scarberry into the interrogation room, and there detective Huels began his interrogation. Miller was in the room for a period of time until he regained his composure. He then left the room, and did not return. Detective Huels conducted the interrogation and elicited from Scarberry the confession. It was later reduced to writing by Huels and signed by Scarberry in the presence of detective Huels and Sergeant Hickman. Scarberry made no claim that Huels struck him, or that the confession was wrung from him involuntarily because of the striking by Miller at 8 a. m.

More than three hours had elapsed from the incident of the striking until the confession was finally formalized. Certainly, the effect of the blow much earlier in the day had lost its effect. We do not in any way condone either the violation of the constitutional rights of an accused person or striking a person under investigation by a police officer, anytime. However, we do feel that the trial judge, seeing the witnesses and hearing the

testimony in the lengthy hearing, out of the presence of the jury, was in much better position to determine the truth of the testimony as to what transpired than we are by reading the record.

The court, in its general charge, carefully outlined the rules of law concerning the admission of a confession and properly left to the jury the final decision as to whether it was voluntary. The charge was complete as to the mental capacity of a person making the confession and the presence or absence of duress, threats or promises. The jury apparently found, as did the trial judge, that the confession was voluntarily made by the defendant while in command of his faculties. It seems to us that the rule enunciated in *Spears* v. *State*, 2 Ohio St., 583, and *Rufer* v. *State*, 25 Ohio St., 464, has been followed. There is an interesting annotation in 69 A. L. R. (2d), 349, on the subject of confessions which we suggest as additional authority for our conclusion that the confession of Scarberry was properly admitted into evidence. The second issue raised by the assignments of error is not well taken.

We now turn to the third issue, namely, the use of a psychiatrist to testify on rebuttal as to the mental capacity of the accused. We must remember that Scarberry entered two pleas to each indictment, namely, not guilty and not guilty by reason of insanity. The defense of insanity being affirmative in nature, the burden is upon Scarberry to establish it by a preponderance of the evidence. There was no expert witness called to testify on behalf of Scarberry. On cross-examination, counsel for Scarberry elicited from Scarberry's wife the fact that he would rant and rave, accusing her of having her alleged boy friend squirt him with ether to anesthetize him so Mrs. Scarberry and her friend could be together without interference by Scarberry. It was also elicited from Mrs. Scarberry on cross-examination that one morning she was awakened by Scarberry placing a cloth soaked in rubbing alcohol on her nose and telling her he was getting even for her having her friend drench him with ether.

Scarberry called on direct examination two patrolmen of the Portsmouth Police Department, namely, Albert Davidson and Roscoe Bussa, to testify as to his mental condition. Patrolman Davidson described Scarberry as "hazy" when he saw him

and talked to him on the evening of December 12, 1959, at the Portsmouth city jail. The witness also told of being at the Scarberry home on Camp Street about three weeks prior to December 12 in his official capacity; that he talked to Scarberry on that day; that Scarberry was in a "confused state"; and that Scarberry's story was told in "not intelligent statements." Officer Bussa described Scarberry as being in a "trance-like state," and did not make any intelligent statments when he saw him between 10:30 p. m. and midnight on December 12. That is all the testimony as to the defense of insanity. Naturally, it was introduced during the defendant's case after the state had rested. It would have been improper for the state to have anticipated the testimony or the proof that Scarberry expected to offer in support of this affirmative defense by calling a psychiatrist to testify during its case in chief. It is true that the evidence tending to show lack of mental capacity on the part of Scarberry was not of the most compelling nature, but nevertheless it was in the case. The only time the state could meet this evidence was on rebuttal. We feel that there is no merit to the third issue raised by the assignments of error and that it is not well taken.

Having disposed of all the issues raised by the assignments of error, we conclude that Scarberry had a fair trial, free from prejudicial error, and, therefore, the judgment herein appealed from is affirmed.

*Judgment affirmed.*

GILLEN, P. J., and COLLIER, J., concur.